UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SALLY J. WANAMAKER,                    :

    Plaintiff,                    :

       vs.                    :       No. 3:11cv1791(MPS)(WIG)

TOWN OF WESTPORT BOARD OF              :
EDUCATION,
                                       :
    Defendant.
-----------------------------------------------------X


RECOMMENDED RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

      Plaintiff, Sally J. Wanamaker, a former elementary school teacher with the Westport

Board of Education ("BOE"), brought this suit against the BOE for alleged violations of the

Family and Medical Leave Act, 29 U.S.C. § 2601 *et seq.* ("FMLA"), the Americans with

Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"), and the Connecticut Fair Employment

Practices Act, Conn. Gen. Stat. § 46a-60(a) *et seq.* ("CFEPA").  On September 25, 2012, the

Honorable Vanessa L. Bryant, District Judge, issued a detailed and well-reasoned opinion on

Defendant's Motion to Dismiss, *Wanamaker v. Westport Board of Education*, 899 F. Supp. 2d

193 (D. Conn. Sept. 25, 2012), granting it in part and denying it in part.  Following this decision,

Plaintiff filed an Amended Complaint [Doc. # 41], which is now the operative complaint.

Pursuant to Rule 56, Fed. R. Civ. P., Defendant has moved for summary judgment [Doc. # 63] on

all five counts of Plaintiff's Amended Complaint on the ground that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  For the reasons set forth

1

below, the Court recommends that Defendant's motion should be granted in part and denied in part.

<u>Summary Judgment Standard</u>

Rule 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Rule 56(a), Fed. R. Civ. P.  The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. *Am. Int'l Group, Inc. v. London Am. Int'l Corp. Ltd.*, 664 F.2d 348, 351 (2d Cir. 1981).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In making these determinations, the Court should review all of the evidence in the record, drawing all reasonable inferences in favor of the non-moving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The Court, however, may not make credibility determinations or weigh the evidence, which are functions for the jury.  *Id.*   Rather, the role of the Court is to determine whether there are genuine issues of material fact for trial.  *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir.), *cert. denied*, 549 U.S. 953 (2006).  "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).  Stated differently, "if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

Factual Background

Judge Bryant's previous ruling on Defendant's Motion to Dismiss sets forth the factual background of this case in detail. *Wanamaker*, 899 F. Supp. 2d at 196-99. Those facts were based upon the factual allegations of Plaintiff's complaint, which the Court properly accepted as true for the purpose of determining whether they "plausibly [gave] rise to an entitlement to relief." *Id.* at 199 (internal citations and quotation marks omitted). For purposes of ruling on Defendant's summary judgment motion, however, the Court must base its decision on the evidence in the record - not mere factual allegations. Thus, although largely duplicative of the factual background set forth in Judge Bryant's ruling, the Court includes herein a detailed discussion of the facts based upon the evidence presented by the parties both in support of, and in opposition to, Defendant's motion.

The facts as presented are undisputed unless otherwise indicated.[1]

Plaintiff began her relationship with the Westport Board of Education as an elementary school paraprofessional at Kings Highway Elementary during the 1998-99 school term, where she assisted three second grade teachers. She then did her student teaching at Green's Farms Elementary School. In the fall of 1999, Plaintiff served as a substitute teacher and, in January 2000, she was hired as a substitute library media specialist at Green's Farms (Pl.'s Ex. 31 at 111). For the 2000-01 school year, Plaintiff was hired on a full-time basis at Green's Farms, with her time allocated as .6 FTE (full-time equivalent) to math support, .2 FTE to gifted math, and .2 FTE as a computer teacher. As an elementary school teacher, the terms and conditions of her

---

[1]   Where the parties have agreed to a statement of fact, no citation to the Local Rule 56 Statements has been provided. Citations to the record have been included if there was any dispute as to the accuracy of a statement, affidavit, or testimony.

employment were governed by a collective bargaining agreement (Def.'s Ex. A).

Plaintiff testified that, during the time she was a student teacher in a regular classroom setting, she had "this revelation that this is just not for me" (Def.'s Ex. OO at 109; Pl.'s Ex. 23 at 102). Thus, in 2001, she interviewed for the computer teacher position at Green's Farms (Def.'s Ex. OO at 124). For the 2001-02 school year, Plaintiff was assigned to the position of full-time computer teacher, and continued in that position until 2009. In 2004, Plaintiff achieved tenure. In 2005, the BOE granted Plaintiff's request to reduce her position to .8 FTE, so that she could take time off during the week for fertility treatments. A .2 FTE computer teacher covered for Plaintiff on Fridays when she was out (Def.'s Ex. Z). From 2001 to 2009, Plaintiff was never rotated out of the computer lab position to a regular classroom teaching assignment (Pl.'s Ex. 31 at 125).

While Plaintiff was employed by the BOE, she was certified in elementary education, kindergarten through sixth grade (Def.'s Ex. C). No separate certification was required to be a computer teacher. Classroom teachers and computer teachers receive the same salary and benefits, and both are evaluated using the same performance indicators and using the same form, the PDEP form (Pl.'s Ex. 32 at 23-25).

Plaintiff described her job as a computer teacher at Green's Farms as follows: The classroom teachers would bring their students for technology education to her computer laboratory, which contained approximately 25 computer workstations that the students would use on a rotating basis (Pl.'s Ex. 31 at 116-18, 123; Pl.'s Ex. 23 at 127-38). Plaintiff developed her own unique lesson plans based upon the Information and Technology Literacy Curriculum that was implemented collaboratively by the computer teacher and the classroom teacher (Pl.'s Ex. 31

4

at 117; Pl.'s Ex. 32 at 27-28).  School Board Superintendent Elliott Landon further elaborated on

the work of the computer teacher:

> We assign . . . whole classrooms to a computer teacher on a
> scheduled basis.  Computer teacher works very, very closely with
> the classroom teacher.  They share the curriculum.  They share the
> activities and the classroom teacher works in the computer
> laboratory with the computer teacher side by side.  Additionally,
> the computer teacher, when not in the laboratory, also had
> unassigned time to work directly with classroom teachers and their
> students on regular classroom curriculum throughout the year.
> Beyond that, the computer teacher meets with the grade-level
> teams to have a full understanding of curriculum so there's an
> integration of function that takes place . . .

(Def.'s Ex. P P at 28; *see also* Pl.'s Ex. 32 at 28).

Plaintiff offered the following comparison of the positions of classroom teacher and

computer teacher: the computer teacher is responsible for one subject at six grade levels; the

classroom teacher is responsible for six subjects at one grade level.  The computer teacher sees

approximately 500 children from 24 to 26 classes; the classroom teacher is with the same 24 to

26 children everyday.  The computer teacher stays in one classroom the entire day; the classroom

teacher moves all over the school with her one class of students, from the classroom to lunch, to

recess, to every special program (Pl.'s Ex. 23 at 250-52).

During the 2008-09 school year, John Bayers became principal of Green's Farms.  In

2008, Plaintiff notified him that she was pregnant.  On February 23, 2009, Plaintiff was

unexpectedly ordered to bed rest by her physician due to complications with her pregnancy.  The

following day, Plaintiff emailed Superintendent Landon:

> Hello Dr. Landon –
>
> I would like to request Family Medical Leave.  I am expecting a

> baby (due April 24), however, was unexpectedly ordered to bedrest
> beginning today.  According to my doctor, it is possible I may
> return to work in one month if I haven't had the baby yet (but it
> will be developed enough that standing up and working won't be a
> risk).
>
> Thank you very much for your consideration!
>
> Sally Wanamaker

(Def.'s Ex. D).  Landon responded that same day:

> Best wishes to you and your family.  Heed your doctor's advice.
> My daughter was ordered to bedrest, she acted accordingly and
> gave birth to a wonderful little girl.
>
> Elliott Landon.

(Def.'s Ex. E).  Plaintiff's requested leave was designated as Family and Medical Leave Act

("FMLA") leave as of February 23, 2009.

On April 30, 2009, Plaintiff gave birth to her daughter.  Thereafter, Plaintiff developed

transverse myelitis as a result of a spinal injury that occurred during childbirth, which caused

severe pain in her back, numbness in her feet and hands, and interfered with her ability to stand

and walk for extended periods, as well as with her bowel functions (Pl.'s Ex. 23 at 13-14, 16-19;

Pl.'s Ex. 27 at 67-68, 70, 88).  As a result of this condition, Plaintiff was hospitalized five times

over the next three months (Def.'s Ex. Z).  Additionally, her daughter was born with a congenital

heart defect that would later require surgery (Pl.'s Ex. 23 at 159-60).

Plaintiff's FMLA leave expired on May 22, 2009 (Pl.'s Ex. 35).  On May 17, 2009,

Plaintiff notified Principal Bayers that she had been hospitalized for "severe and unaccounted for

pain and numbness for almost 2 weeks" (Def.'s Ex. G).  Bayers responded, expressing his

regrets, hoping that things worked out quickly, and inquiring if he could update the staff on her

situation (Def.'s Ex. H).  Plaintiff was then given extended sick through June 22, 2009.  Her expected return date was August 27, 2009 (Def.'s Ex. F).  During her absence, her responsibilities as a computer teacher at Green's Farms were filled by Sherry Black, a long-term substitute teacher.  Plaintiff worked closely with Black on lesson plans for the remainder of the school year (Def.'s Ex. Z).

On June 21, 2009, Plaintiff again informed Bayers by email that she was again hospitalized for "continued undiagnosed severe pain, and a bad reaction to a thoracic epidural they did the day after the staff picnic that was supposed to help the pain," and that she was "about 2 months behind in life (paperwork, bill paying, etc.)" (Def.'s Ex. I).

According to Plaintiff, around mid- to late-July, she had a conversation with Marggaret Brienes in Human Resources about her options.  Brienes informed Plaintiff that if she stayed out on medical leave, as opposed to unpaid leave, her job would be held for her (Pl.'s Ex. Z).  Based upon this advice, Plaintiff consulted with her neurologist, Dr. Peter J. McAllister, and requested that he write a note to Bayers letting him know that she might not be able to return at the beginning of the school year (*Id.*).

On July 27, 2009, Plaintiff emailed Bayers, stating that she had been diagnosed with Transverse Myelitis and that "getting through the day [was] a challenge" (Def.'s Ex. J).

Around this time, Plaintiff and Bayers had a conversation about whether Plaintiff would be returning and whether Bayers could retain Black for the beginning of the 2009-10 school year (Pl.'s Ex. 23 at 169).  On August 4, 2009, Plaintiff faxed to Bayers a letter from her neurologist, Dr. McAllister, dated July 24, 2009 (Def.'s Ex. K), in which he explained that Plaintiff had developed an inflammation of her spinal cord after delivery, which had led to "severe pain and

7

marked disability." He reported that they were aggressively working her up and treating her, but "she wanted [Bayers] to have a 'heads up' that, unless we turn the pain around rather dramatically in the next six weeks, she may not be able to work or may be able to only work on a limited basis" (Pl.'s Ex. 7). At that point, Dr. McAllister was unwilling to opine how much additional leave Plaintiff would require at the beginning of the school year (*see* Def.'s Ex. L), but he later testified that, in his opinion, she did not have the ability to work at all as of July 24, 2009 (Def.'s Ex. QQ at 35).

On August 6, 2009, Plaintiff emailed Bayers:

> I faxed to you the note that I received from my neurologist yesterday. I realize that it is vague and doesn't state exactly what time off I will need, so I called him yesterday and asked him if he could write a letter that would be more specific. He said that it is hard for him to predict how I will be in one month. I explained that you really need something concrete in order to get staffing in order for the beginning of the year. He asked me to call him in one week, we would assess how things are going, and likely he would write a note for a 60 day sick leave followed by a reassessment in the office. I asked if he could write that note now, and he said he was more comfortable waiting a week to see how I was doing.

(Def.'s Ex. L). Bayers responded on August 10, 2009, asking her to call him when she had a chance "to discuss [her] situation" (Def.'s Ex. M).

During the summer, staffing decisions for Green's Farms were being made, and it was projected that one teacher would have to be displaced from Green's Farms for 2009-10 due to budget constraints and decreased student enrollment. According to Landon, staffing decisions were made by Bayers, who presented them to Landon, although they did not require his approval (Pl.'s Ex. 22 at 28). Landon testified that, given the indefiniteness of Plaintiff's leave of absence, Bayers wanted to reassign someone to the computer teacher position. Given the number

8

of vacancies due to planned absences (maternity leaves) throughout the school year, Bayers anticipated being able to assign Plaintiff to a classroom when she returned (Def.'s Ex. LL, Landon Aff. ¶ 20). This assignment would be as a building substitute, filling in for classroom teachers who were taking maternity leave. Bayers explained that, when a teacher is hired by the BOE, he or she does not have any continuing right to remain in a particular assignment. Every year, he makes staffing decisions in consultation with the central office, based upon staffing needs and the needs of the students (Def.'s Ex. MM, Bayers Aff. ¶ 10).

While there is some discrepancy in the record as to exactly when a decision regarding Plaintiff's employment was made, according to Landon and Bayers, once they learned that Plaintiff would be out for at least 60 days at the start of the school year, they finalized what they had previously discussed, which involved assigning a classroom teacher to the computer teacher position and giving Plaintiff a classroom assignment when she returned to fill in for anticipated absences (Def.'s Ex. LL, Landon Aff. ¶ 22; Def.'s Ex. MM, Bayers' Aff. ¶ 28). Landon testified that, with this arrangement, Plaintiff would not suffer a loss of salary or benefits and would have a regular teaching position, covering for teachers on leave ( Def.'s Ex. LL, Landon Aff. ¶ 22). This would also ensure consistency throughout the school year for the computer teacher assignment, and also avoided the need to possibly displace another classroom teacher from Green's Farms at the beginning of the school year (Def.'s Ex. LL, Landon Aff. ¶ 23; Def.'s Ex. MM, Bayers Aff. ¶ 29).

At some point, during the week of August 10, 2009, Bayers spoke by telephone with Plaintiff and informed her of the likelihood that she would be reassigned to the classroom upon her return (Def.'s Ex. MM, Bayers' Aff. ¶¶ 24-25). According to Plaintiff, Bayers told her that

he had already offered the computer teaching job to Black, who had accepted (Pl.'s Ex. 23 at 186), although, as it later turned out, Black was not given this position.  Plaintiff was upset with this news and related to Bayers that she was contacting the Union (Def.'s Ex. MM, Bayers' Aff. ¶ 25).

Despite the fact that Plaintiff would have retained her salary and benefits, Plaintiff regarded the position of building substitute as a demotion.  She testified that every day she could have a different classroom assignment; there would be no predictability; there would be "a ton more physical activity than in the computer position.  A ton more stress.  A huge learning curve" (Pl.'s Ex. 23 at 189).  On days in which there were no openings for a substitute teacher, the building substitute would be in the office doing filing, cleaning out the refrigerator in the staff room.  "It would have been extremely humiliating to go back into that role" (Pl.'s Ex. 23 at 190).

Plaintiff also did not want a classroom teacher position at that time because of the differences in the two jobs.  The first year of teaching was always very stressful and difficult.  Plaintiff felt that she had enough stress in her life and did not want to endanger her own health.  She also did not feel that it would be fair to the students (Pl.'s Ex. 23 at 198).

According to Bayers, Plaintiff did not indicate that she would be able to return at the beginning of the school year nor did she request any accommodation that would allow her to return (Def.'s Ex. MM, Bayers' Aff. ¶ 26).  Plaintiff, on the other hand, testified that she told Bayer that if her employment was indeed at stake, she would return to her position as the computer teacher by the beginning of the school year and, at most, would need a brief medical leave or some reasonable accommodation such as teaching from a chair instead of standing (Pl.'s Ex. 27 at 119-20; Pl.'s Ex. 23 at 177-78).

On August 12, 2009, Dr. McAllister hand-wrote a note stating that "due to her neurological illness," Plaintiff would not be able to work for a period of at least 60 days from the start of the school year" (Def.'s Ex. N).

On August 13, 2009, after receiving a message from Bayers, Plaintiff emailed him that she was headed to Mt. Sinai Hospital for an appointment with an MS specialist, who treated Transverse Myelitis.

On August 13, 2009, Plaintiff emailed John Horrigan, the Union Treasurer, stating that she had been informed no later than August 10, 2009, that Bayers had been reviewing her situation with Superintendent Landon and they had decided "for the consistency of the computer program at Green's Farms, and because they [were] concerned about [her], they [were] going to put someone in the computer job [for 2009-10] . . . and when [she came back she could] spend the year covering the many maternity leaves" (Pl.'s Ex. 8).

Horrigan contacted Edward Huydic, the Union President, advising him that Plaintiff was upset about the proposed job placement.  Huydic then spoke with Landon, who confirmed that the position being offered to Plaintiff was a "building substitute" position (Def.'s Ex. P P at 15). Landon made clear that they had no issue with Plaintiff's job performance (Pl.'s Ex. 31 at 15-16). Huydic described this decision as "somewhat out of the ordinary" but not improper, under the terms of the Union contract, as this position was within Plaintiff's certification (Def.'s Ex. P P at 17, 47).  Huydic informed Plaintiff that he did not think the Union could successfully manipulate the situation so that she would be placed in the computer teaching position (Pl.'s Ex. 31 at 48). And, in fact, the Union never filed a grievance on Plaintiff's behalf.

Huydic testified that, during his conversation with Landon, Landon inquired about

Plaintiff's health and the health of the baby (Pl.'s Ex. 31 at 21-22).

On August 17, 2009, an email from Bayers to Landon and Marge Cion, the Director of Human Resources for the BOE, announced that, due to a drop in kindergarten numbers, Sarah Stefans, a kindergarten teacher, would move to Grade 2, that Nicole Fieschel would move from Grand 2 to Computer, and that Plaintiff would be on leave for at least the first two months of school.  He stated, "We will determine her position upon her possible return" (Def.'s Ex. O). Fieschel was non-tenured at the time and is not disabled.   Bayers testified that, at the time he made the decision to move Fieschel to the computer teaching position (with the approval of Landon), he did not have any criticism of Plaintiff's performance (Pl.'s Ex. 21 at 31).

On September 4, 2009, Cion wrote Plaintiff confirming that, because she had sufficient accrued sick time, there would be no interruption in her pay or medical benefits during this 60-day medical leave of absence, which would expire on October 26, 2009.  She asked Plaintiff to provide Human Resources with a note from her doctor before returning to work, which should state when she was able to return to work and if there would be any restrictions on her duties (Def.'s Ex. P).

On October 20, 2009, PA Karen Brown with Associated Neurologists faxed a note to Cion stating that Plaintiff was unable to return to work due to her medical condition through December 21, 2009 (Def.'s Ex. Q).  On November 3, 2009, she sent a second fax stating that Plaintiff could not return to work until December 31, 2009 (Def.'s Ex. R).

On December 9, 2009, Plaintiff emailed Cion that she would let her know what her doctor said about returning to work on January 1st (Def.'s Ex. U).  She further stated that, as she was weaning off morphine, which she had been on for seven months, her symptoms were rushing

12

back, but she really wanted and needed to be off of narcotics (Def.'s Ex. U).  In response, Cion
reminded her that, as a tenured teacher, she could apply for unpaid leave, which was up to
Landon to approve (Def.'s Ex. U).

Dr. McAllister followed up with a hand-written note to Cion dated December 17, 2009,
stating that "[d]ue to her ongoing neurological condition, Mrs. Wanamaker needs to remain out
of work, full restriction, for a period of 90 days, at which time she'll be reevaluated" (Def.'s Ex.
T)(underlining in original).  The BOE approved each of Plaintiff's requests for extended leave.

On December 28, 2009, Plaintiff and Cion had an exchange of emails regarding
Plaintiff's flexible spending account if she were to take unpaid leave.  Plaintiff thanked Cion for
the information and related that the "tricky part" was that she did not know if she was going to be
on unpaid leave or released to return to work.  She indicated that she would not be seeing Dr.
McAllister until March but that she planned to return to see the neurologist at Yale before then,
as her symptoms did not appear to be changing and her feet were still numb.  She noted that Dr.
McAllister told her that time was what she needed, but, she remarked, "time won't pay for my
health insurance," so she planned to get a second opinion.   She concluded that "[e]ither way I am
sure I will be using the Flex Spending Acct in some form as Lucy [her baby] has her follow up
for her heart condition, I have my medical condition and Chris [her huband] has Lupus, all
conditions that incur medical expenses.  I will be back in touch after reviewing with my
husband" (Def.'s Ex. V).

On March 2, 2010, Plaintiff faxed a note from Dr. McAllister to Cion stating that Plaintiff
was "neurologically cleared to return to work one day per week in April (beginning April 6th),
then two days a week in May and June, non consecutive" (Def.'s Ex. W).  In response, on March

5, 2010, Landon emailed Plaintiff:

> 1. Based upon the clearance given by your doctor, it is our determination that you are unable at this time to fully perform the essential job functions of a teacher.
> 2.  We do not have any "one day" teaching assignments.
> 3.  At such time as you are able to return to our employ as a full time teacher, we will re-assess our determination that you are unable to fully perform the essential functions of a teacher.
>
> Given your desire to return to work on a one-day-a-week basis, we are willing to employ you as a *per diem* teacher until you are able to fully perform the essential job functions of a teacher.

(Def.'s Ex. X).  According to Landon, a *per diem* teacher would receive 1/180th of his or her annual salary for each day worked, not the $90 per day paid to regular substitute teachers  (Def.'s Ex. LL, Landon Aff. ¶ 27).[2]  Plaintiff, however, testified that this was never communicated to her.  She had informed Landon that she was not going to work for $90 per day, and he never corrected her assumption that this would be her salary (Pl.'s Ex. 23 at 222).

As of March 17, 2010, Plaintiff had exhausted all of the accrued paid time-off and the remainder of her leave was unpaid (Def.'s Ex. NN, Cion Aff. ¶ 18).

Having received no response from Plaintiff to his March 5th letter, on April 14, 2010, Landon wrote Plaintiff,

> As of this date, you have not responded to my offer to accept a *per diem* teaching assignment, nor have you advised of your intention to return to our employ.
>
> It is now evident that you have no intention to return to work in the Westport Public Schools and to perform the essential job functions of a teacher.  As such, I am informing you by way of this communication that you will need to tender your resignation from

---

[2]  Landon distinguished a *per diem* teacher from a *per diem* substitute, who would receive only $90 per day (Def.'s Ex. P P, Landon Testimony 29-30).

> our employ.  Failure to do so will result in my initiating
> termination proceedings to end your employment with the
> Westport Public Schools.

(Def.'s Ex. Y).  Landon copied Thomas Mooney, the BOE's attorney, on this letter.  Plaintiff

testified that, after she saw this, she decided she needed to retain an attorney as well (Pl.'s Ex. 23

at 224-25).

On April 26, 2010, at Cion's suggestion that there musts have been a misunderstanding,

Plaintiff responded to Landon with a six-page, single-spaced letter, in which she outlined the

background of her employment, her requests for leave, etc., and concluded:

> The only conclusion that I can come to is that I am somehow being
> retaliated against because I need to take time off for my illness and
> am now perceived as needing time off in the future due to my
> medical condition and that of my infant daughter.
>
> Since you have not permitted me to return to my position as
> Computer Teacher (or to the position of Substitute Teacher with
> my daily payrate as John Bayers offered me back in August), the
> responsibilities of which I am fully capable of performing with
> minor accommodations, I would like to request an unpaid leave for
> the remainder of the year.  I would also like to be reinstated to the
> job of Computer Teacher at Greens Farms School next year.

(Def.'s Ex. Z).

Landon granted her request for an unpaid leave of absence through the end of the school

year.  Noting that the next school year would be most difficult due to declining enrollment and

the return of many of the tenured elementary school teachers, he agreed to hold open a regular

elementary classroom teaching position in one of five elementary schools and asked that she

notify him no later than June 11, 2010, whether she would be returning (Def.'s Ex. AA; Def. Ex.

PP, Landon Testimony 23).  Through her attorney, Plaintiff responded on May 27, 2010, that she

was willing to return to her original position as a Technology Teacher at Green's Farms "or an equivalent position, as equivalent position is defined under state law and regulations, as of August 2009."   The letter concluded, "[i]f we do not receive a response by June 15, 2010, we will assume that the District has no interest in an equitable resolution of this matter" (Def.'s Ex. BB).

On July 29, 2010, Plaintiff's counsel sent a second letter, this time to the BOE's attorney, Mooney, advising him that Plaintiff had been medically cleared to return to her original "Technology Teacher position or to an equivalent position" (Def.'s Ex. CC).  Plaintiff's counsel reiterated his position that a regular classroom teaching job was not an "equivalent position" to the Technology Teacher job Plaintiff previously held  (Def.'s Ex. CC).  To his letter was appended a letter from Dr. McAllister dated July 1, 2010, stating that Plaintiff "continues to recover from her inflammatory myelitis.  She is currently able to resume her occupation as Technology Teacher which, by nature, has limited physical requirements, but I do not feel she should endanger her recovery with a new, unfamiliar physically and emotionally stressful, physically active position of a full time classroom teacher" (Def.'s Ex. CC).  Dr. McAllister testified that he had no personal knowledge of the essential functions of these jobs.  His understanding was based on information provided to him by Plaintiff (Def.'s Ex. QQ, McAllister Dep. 14).

On August 16, 2010, Landon wrote Plaintiff that, on behalf of the BOE, he was accepting her resignation of employment (Def.'s Ex. DD).

After Plaintiff advised Landon that she had not resigned her employment, he wrote her on August 18, 2010, that "[w]ithout prejudice to my position that your refusal of the assignment

16

offered you was in fact a resignation of your employment, pleased be advised that the termination of your contract of employment as a teacher in the Westport Public Schools is under consideration" (Def.'s Ex. EE).  He advised her of her rights to a statement of reasons and to request a hearing.   He concluded, "[a]ll further proceedings will be conducted in accordance with Conn. Gen. Stat. Section 10-151" (Def.'s Ex. EE).

In response, Plaintiff requested a statement of the reasons with specifics as to times, locations, witnesses, and related documentation (Def.'s Ex. FF).

On September 2, 2010, Landon responded that the reasons for considering termination of her employment were: insubordination against the reasonable rules of the BOE; disability as shown by competent medical evidence; and other due and sufficient cause (Def.'s Ex. GG). Landon took the position that "there is no material difference between the classroom teaching position I offered you last May and last July and the one specific position you are demanding" (Def.'s Ex. GG).

Thereafter, Plaintiff's counsel requested a hearing before a tripartite panel, pursuant to the Employment of Teachers Statute, Conn. Gen. Stat. § 10-151a (Def.'s Ex. HH).  A five-day hearing ("the § 10-151 hearing") was then held before a panel consisting of Peter Adomeit, Esq., Chair, Joseph Garrison, Esq., appointed by Plaintiff, and John Romanow, Esq., appointed by the BOE.  On April 14, 2011, the panel issued its Findings of Fact and Recommendation to the BOE that Plaintiff's failure to report or perform her assignment as a classroom teacher for the 2010-11 school year constituted abandonment and provided "other due and sufficient cause" under Conn. Gen. Stat. § 10-151(d)(6) for her termination (Def.'s Ex. JJ).   The recommendation of the panel was accepted and adopted by the BOE on April 27, 2011 (Def.'s Ex. KK).

Horrigan, who was one of three presidents of the Teachers' Union as of the summer of 2010, testified that, in his opinion and based upon his experience in the Westport school system since 1989, Landon could reassign teachers so long as they held the proper certification for the new position (Pl.'s Ex. 18 at 21, 30).  It was also his observation that, after a teacher took a medical leave of absence, when she returned, she returned to the job she had left, not a different job (Pl.'s Ex. 18 at 37, 75).  However, that was not necessarily true if the teacher took unpaid leave (Pl.'s Ex. 18 at 37, 39, 75).  He testified further that, if a teacher was going to be terminated, the Union would get involved to work with Landon on an exit strategy that would not involve a termination (Pl.'s Ex. 18 at 25).  He could only recall a few tenured teachers who had been terminated (Pl.'s Ex. 18 at 26).  He further explained that, if a teacher were offered a different assignment and she declined to take it, in his opinion, the BOE would need to institute a termination hearing (Pl.'s Ex. 18 at 77).

As for the BOE's decision to give Plaintiff's computer teaching job to another person, Horrigan did not think the decision was reasonable or fair (Pl.'s Ex. 18 at 28).  In fact, he described it as a "shocking situation" (Pl.'s Ex. 18 at 57-58).  Plaintiff had been out on leave, and she had exercised due diligence in helping the substitute during her absence (Pl.'s Ex. 18 at 28).  Horrigan also questioned the BOE's and Landon's failure to advise the Union that Plaintiff, who was a Union member, was going to be terminated.  He would have expected the Union to have been kept in the loop when a termination was involved (Pl.'s Ex. 18 at 54-56).  He noted that it was Plaintiff, not the BOE, who contacted the Union (Pl.'s Ex. 18 at 77).  He also stated, that based on his experience, a decision by the BOE to move a teacher to a different teaching assignment would generally not be made at the end of the summer, but rather earlier in the year

18

so that the teacher would have time to plan for the upcoming school year (Pl.'s Ex. 18 at 94). Likewise, Diann Drenosky, another of the three Union presidents, testified that she was surprised that Landon had not talked to the Union before terminating Plaintiff (Pl.'s Ex. 19 at 43).

Plaintiff testified that she believed she could have performed her computer teacher job at the beginning of the 2009-10 school year, because the physical requirements of that job are significantly different than for a building substitute (Def.'s Ex. P P at 124). She further testified that she never requested an accommodation for the building substitute teacher position because she did not believe that there were any accommodations that could be made when every day was something different. "It would have been like hiring a full-time paraprofessional to follow [her] around" (Def.'s Ex. P P at 124; Pl.'s Ex. 23 at 209-10).   As of the fall of 2010, she would have been able to perform the job of classroom teacher, but that she did not accept the offer of that position because she believed her rights had been violated (Def.'s Ex. OO, Pl.'s Dep. 232).

Huydic, Horrigan, and Drenosky testified that teacher absences had been a big issue to Landon (Pl.'s Ex. 31 at 24, Pl.'s Ex. 18 at 40, 59; Pl.'s Ex. 19 at 27).  In fact in 2008, Landon had sent out letters to teachers with excessive absences. A number of the teachers found the letter to be unfair, intimidating, and unreasonable  (Pl.'s Ex. 18 at 43-44).  Huydic met with Landon on several occasions about these letters and, ultimately, it was determined that the letters would be sent from Human Resources (Pl.'s Ex. 31 at 26, 27, 39, 30).

<u>Discussion</u>

I.  Collateral Estoppel

Initially, Defendant asserts that collateral estoppel, or issue preclusion, prevents Plaintiff

from relitigating those issues previously litigated in the § 10-151 hearing.  Defendant maintains

that Plaintiff had the opportunity to fully and fairly litigate her case, and that the Impartial Panel

determined that Plaintiff had engaged in job abandonment, which constituted "other due and

sufficient cause" to terminate her employment under Conn. Gen. Stat. § 10-151(d)(6).

Because the decision of the Impartial Panel was rendered in Connecticut, this Court must

look to the law of Connecticut to determine the preclusive effect of that proceeding.  *Migra v.

Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984); *LaFleur v. Whitman*, 300 F.3d 256,

271 (2d Cir. 2002).  In Connecticut, to be subject to collateral estoppel, an issue must have been

(1) fully and fairly litigated, (2) actually decided, (3) necessary to the judgment in the first action,

and (4) identical to the issue to be decided in the second action.  *Virgo v. Lyons*, 209 Conn. 497,

501 (1988);  *Crochiere v. Bd. of Educ. of Town of Enfield*, 227 Conn. 333, 343 (1993); *State v.

Joyner*, 255 Conn. 477, 490 (2001); *Faraday v. Blanchette*, 596 F. Supp. 2d 508, 515 (D. Conn.

2009).  Issue preclusion expresses "no more than the fundamental principle that once a matter

has been fully and fairly litigated, and finally decided, it comes to rest."  *State v. Ellis*, 197 Conn.

436, 465 (1985).

It is well-settled that a valid and final administrative adjudication may give rise to

collateral estoppel.  *New England Rehab. Hosp. of Hartford, Inc. v. Comm'n on Hosps. & Health

Care*, 226 Conn. 105, 129 (Conn. 1993); *Genovese v. Gallo Wine Merchs., Inc.*, 226 Conn. 475,

483-84 (1993).  The burden is on Defendant, as the party asserting collateral estoppel, to prove

these requirements.  *Kulak v. City of New York*, 88 F.3d 63, 72 (2d Cir. 1996); *Havoco of Am.

Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58 F.3d 303, 308 (7th Cir. 1995).

Initially, to invoke collateral estoppel, Defendant must demonstrate an identity of issues

between those litigated in the prior proceeding and those sought to be litigated in this case.  *See*

*Crochiere*, 227 Conn. at 345.  At the § 10-151 hearing, while Plaintiff may have had a full and

fair opportunity to litigate the issue of whether she engaged in "job abandonment," Plaintiff did

not litigate, nor did the Panel consider or determine Plaintiff's federal and state discrimination

claims.  Indeed, the Panel went to great lengths to make clear the issues that it was *not* deciding.

> We make no finding as to whether Ms. Wanamaker was
> constructively discharged.  We have no jurisdiction to do so.
> Under the decisions of the Connecticut Supreme Court, a teacher
> facing termination cannot under a Section 10-151 hearing assert
> claims arising under other laws. . . .
>
> Thus, the claim that the administration did not offer Ms.
> Wanamaker a "comparable" position within the meaning of the
> Connecticut anti-discrimination laws; or whether the only
> comparable position was that of a computer teacher; or whether the
> administration had a legal duty to remove someone from that
> assignment and give it to Ms. Wanamaker are all issues which can
> only be addressed by the agencies assigned that jurisdiction under
> Connecticut law.  We have no jurisdiction to decide them.  To try
> them under a Section 10-151 hearing would trespass on the
> procedures and jurisdiction of the state courts and the Connecticut
> Commission on Human Rights and Opportunities.  The panel has
> decided that under the law as stated by the Connecticut Supreme
> Court, the panel has no jurisdiction to make findings as to whether
> the Administration did or did not comply with these laws.

(Def.'s Ex. JJ at 19-20).   Clearly, Plaintiff did not have a full and fair opportunity to litigate her

FMLA, CFEPA, and ADA claims in this earlier proceeding, and, thus, collateral estoppel does

not bar the litigation of those claims in this case.  *See Faraday*, 596 F. Supp. 2d at 515;  *Marvel*

*Characters,* 310 F.3d at 288; *Prestopnik v. Whelan*, 249 F. App'x 210, 212 (2d Cir. 2007)

(holding that collateral estoppel did not bar plaintiff from litigating her equal protection claims in

federal court where the state court explicitly noted that it made no findings as to the

constitutionality of the school district's tenure decision).

Additionally, Connecticut would not give preclusive effect to the findings of the Panel because Conn. Gen. Stat. § 31-51bb explicitly provides that a statutory claim cannot be lost just because an employee is covered by a collective bargaining agreement.  Section 31-51bb provides:

> No employee shall be denied the right to pursue, in a court of competent jurisdiction, a cause of action arising under the state or federal Constitution or under a state statute solely because the employee is covered by a collective bargaining agreement.

This statute was enacted to ensure that employees covered by a collective bargaining agreement retained the right to pursue a statutory cause of action despite an adverse determination in a grievance or arbitration proceeding. *Genovese*, 226 Conn. at 484-86 (citing *McDonald v. West Branch*, 466 U.S. 284 (1984); *Barrentine v. Arkansas-Best Freight Sys.*, 450 U.S. 728 (1981); *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), in which the U.S. Supreme Court refused to give preclusive effect to a prior arbitral decision in a subsequent court action brought to vindicate an employee's statutory rights).  Thus, the issues presented in this case are not subject to attack based upon the doctrine of collateral estoppel.  *See Nichols v. City of Bridgeport*, No. CV020394052, 2008 WL 2895901, at *6 (Conn. Super. Ct. July 7, 2008).

## II.  Plaintiff's FMLA Claims

Defendant raises three grounds for granting summary judgment as to Plaintiff's FMLA interference and retaliation claims asserted in Counts I and II of her Amended Complaint:  (1) her FMLA interference claim fails as a matter of law because she was granted twelve weeks of FMLA leave and she was still unable to return to work at the end of this period; (2) her FMLA retaliation claim fails as a matter of law because Plaintiff cannot demonstrate that she was

22

terminated or constructively discharged; and (3) her FMLA claims are barred in part by the applicable two-year statute of limitations, 29 U.S.C. § 2617(c)(1).

The FMLA creates a series of substantive rights or entitlements for eligible employees. It grants to eligible employees the right to "a total of 12 workweeks of leave during any 12-month period" . . . "[b]ecause of the birth of a son or daughter of the employee and in order to care for such son or daughter," "[i]n order to care for the . . . son [or] daughter . . . if such . . . son [or] daughter has a serious health condition," or "[b]ecause a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1). The FMLA further grants to the employee the right to be reinstated to his or her former position or an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment, upon return from such leave. 29 U.S.C. § 2614(a)(1). The right to reinstatement, however, is not absolute. "If the employee is unable to perform an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition, . . . the employee has no right to restoration to another position under the FMLA." 29 C.F.R. § 825.216(c); *see Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 161-62 (2d Cir. 1999). To ensure the availability of these rights, the FMLA makes it unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter," 29 U.S.C. § 2615(a)(1) or "to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2); *see also* 29 U.S.C. § 2615(b) (making it unlawful for an employer to discharge or in any other manner discriminate against any individual because such individual has filed a charge or instituted proceedings under this

23

subchapter, has given or is about to give information in connection with any inquiry or proceeding relating to any right provided under this subchapter, or has testified or is about to testify in any inquiry or proceeding relating to any right provided under this subchapter).

The Second Circuit has recognized two distinct FMLA causes of action - interference claims based upon § 2615(a)(1), and retaliation claims based upon § 2615(a)(2) and § 2615(b). *Potenza v. City of New York*, 365 F.3d 165, 167-68 (2d Cir. 2004); *Wanamaker*, 899 F. Supp. 2d at 204.  With interference claims, the issue is simply whether the employer provided the employee with the entitlements set forth in the FMLA - for example, a twelve-week period of leave or reinstatement following a medical leave.  The employer's subjective intent is not an issue.  *Reid-Falcone v. Luzerne Cnty. Cmty. Coll.*, No. 3:CV-02-1818, 2005 WL 1527792, at *4 (M.D. Pa. June 28, 2005). With retaliation claims, however, retaliatory or discriminatory intent is an issue.  *Id.* at *9.

In this case, Plaintiff alleges both.  In Count I of her Amended Complaint, she claims that Defendant interfered with the exercise of her rights under the FMLA by terminating her employment and refusing to restore her to her position or an equivalent position (Pl.'s Am. Comp. ¶ 44) and by terminating her because it anticipated that she would need to take FMLA leave in the future (Pl.'s Am. Comp. ¶ 45).   Plaintiff further alleges in Count II that Defendant retaliated against her by terminating her for her use of FMLA leave and her anticipated future use of protected FMLA leave, as well as her complaints about Defendant's conduct that violated her rights under the FMLA (Pl.'s Am. Comp. ¶ 48).

A.  Plaintiff's FMLA Interference Claim

To establish a prima facie case of interference with FMLA rights under 29 U.S.C. §

2615(a)(1), a plaintiff must establish five elements: (1) that she is an eligible employee under the FMLA; (2) that the defendant is an employer as defined by the FMLA; (3) that she was entitled to leave under the FMLA; (4) that she gave notice to the defendant of her intention to take leave; and (5) that she was denied benefits to which she was entitled under the FMLA. *Basso v. Potter*, 596 F. Supp. 2d 324, 337 (D. Conn. 2009); *Ridgeway v. Royal Bank of Scotland Grp.*, No. 3:11cv976, 2012 WL 1033532, at *6 (D. Conn. Mar. 27, 2012). There can be no dispute that Plaintiff has met the first four elements. There also is no dispute that Plaintiff received her twelve weeks of FMLA leave. Her leave commenced on February 23, 2009, when she was ordered to bedrest for unexpected complications with her pregnancy (Def.'s Ex. F; Pl.'s Resp. to Def.'s St. ¶ 21). Her daughter was born on April 30, 2009 (Pl.'s Resp. to Def.'s St. ¶ 22). Plaintiff's FMLA leave expired on May 22, 2009, after which she was given extended leave to the end of the school year (Pl.'s Resp. to Def.'s St. ¶ 24). Thus, Plaintiff cannot base her FMLA interference claim on a denial of leave. *See Singh v. New York State Dept. of Taxation and Fin.*, 911 F. Supp. 2d 223, 240 (W.D.N.Y. 2012) (holding that the plaintiff could not establish an FMLA interference claim where she was granted the requested 12 weeks of FMLA leave and then took an extended leave of absence).

The only other benefit that Plaintiff was allegedly denied was reinstatement to her former computer teaching position or an equivalent position. *See Geromanos v. Columbia Univ.*, 322 F. Supp. 2d 420, 428 (S.D.N.Y. 2004) ("Because plaintiff received the full twelve weeks of leave as allowed by the act, the only other right with which Columbia could be found to have interfered is the right to reinstatement at the end of her leave."). "Failure to reinstate an employee to a prior position or its equivalent following FMLA leave is a properly pled FMLA interference claim."

*Gauthier v. Yardney Technical Prods., Inc.*, No. 3:05cv1362, 2007 WL 2688854, at *7 (D. Conn. Sept. 13, 2007).  "An equivalent position is one that is 'virtually identical' to the employee's former position 'in terms of pay, benefits, and working conditions,' and it 'must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority.'" *Wanamaker*, 899 F. Supp. 2d at 206 (quoting *Pizzo v. HSBC USA, Inc.,* No. 04-CV-114A, 2007 WL 2245903, at *5 (W.D.N.Y. Aug. 1, 2007) (quoting 29 C.F.R. § 825.215(a))).  While the parties spend considerable time arguing about whether Plaintiff was offered a position that was "equivalent" for purposes of the FMLA to her former computer teaching position, the Court does not need to reach that issue.

Rather, as Defendant contends, the Court finds that Plaintiff has no viable FMLA interference claim because at the expiration of her twelve weeks of FMLA leave, she was not medically able to return to work and, therefore, she was not entitled to reinstatement to the same or equivalent position.  The regulations provide that, if the employee is unable to perform "an essential function of the position because of a physical or mental condition, including the continuation of a serious health condition . . . the employee has no right to restoration to another position under the FMLA."  29 C.F.R. § 825.216(c).

Plaintiff, however, argues that Defendant voluntarily extended her leave until the beginning of the next school year and is now equitably estopped from using this extension of leave against Plaintiff.

In *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 725 (2d Cir. 2001), the Second Circuit held that the "doctrine of equitable estoppel is properly invoked where the enforcement of the rights of one party would work an injustice upon the other party due to the

latter's justifiable reliance upon the former's words or conduct."  Under federal law, which applies when a claim of equitable estoppel is made under a federal statute, "a party may be estopped from pursuing a claim or defense where:  (1) the party to be estopped makes a misrepresentation of fact to the other party with reason to believe that the other party will rely upon it; (2) and the other party reasonably relies upon it; (3) to her detriment."  *Id.* (citing *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 59 (1984)).  "Whether equitable estoppel applies in a given case is ultimately a question of fact."  *Id.*

In *Murphy v. FedEx National LTL, Inc.*, 618 F.3d 893, 899-900 (8th Cir. 2010), the Eighth Circuit held that "an employer who makes an affirmative representation that an employee reasonably and detrimentally believed was a grant of FMLA leave can be estopped from later arguing that the employee was not in fact entitled to that leave because she did not suffer a serious health condition."  Reversing a judgment in favor of the plaintiff, the court held that, on remand, the district court "must instruct the jury that, in order to return a verdict for [the plaintiff], it is required to find that [the plaintiff] reasonably believed that [the employer] represented that it granted her FMLA leave, rather than some other kind of leave."  *Id.* at 900; *see also Woodford v. Cmty. Action of Greene Cty., Inc.*, 268 F.3d 51, 57 (2d Cir. 2001) (holding that the doctrine of equitable estoppel may apply in the context of a FMLA interference claim).

In this case, there are at least two obstacles to Plaintiff's invocation of collateral estoppel to preserve her FMLA interference claim.  First, Plaintiff is seeking to use collateral estoppel against a governmental defendant. "[I]t is well-settled that the Government may not be estopped on the same terms as any other litigant."  *Heckler*, 467 U.S. at 60; *see Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 421 (1990) (suggesting that some type of "affirmative misconduct" on

27

the part of the Government is required to give rise to estoppel); *see also Nagle v. Acton-Boxborough Reg'l Sch. Dist.*, 576 F.3d 1, 4 (1st Cir. 2009) (discussing the rationale for this distinction).

The second and more significant reason is that Plaintiff does not contend, nor does the evidence support a finding, that Defendant told her it was extending her FMLA leave.  Instead, Plaintiff has admitted that, when her FMLA leave expired on May 22, 2009, she was given "extended leave."  (Def.'s St. ¶ 24, admitted by Pl.).  There is no evidence that Defendant affirmatively represented to her that this extended leave was FMLA leave.  *See Sjoblom v. Jersey Shore Med. Ctr.*, No. 05-1042, 2006 WL 1228709, at *4 (D.N.J. May 5, 2006) (dismissing the FMLA claims where the employer provided actual notice as to when the FMLA leave expired); *cf. Spagnoli v. Brown & Brown Metro, Inc.*, No. 06-414, 2007 WL 2362602, at *14 (D.N.J. Aug. 15, 2007) (finding issues of material fact as to whether the employer advised the plaintiff as to when her FMLA leave would expire).  Here, Plaintiff's right to reinstatement under the FMLA expired when her FMLA leave expired.  *See Ridgeway,* 2012 WL 1033532, at *10.

As the Court held in *Ridgeway*, a claim for interference on the basis of a failure to reinstate is "not cognizable as a violation of FMLA, where [the plaintiff] remained on leave beyond the expiration of [her] FMLA leave."  *Id.*  Likewise, in *Sabatino v. Flik Int'l Corp.* 286 F. Supp. 2d 327, 336 (S.D.N.Y. 2003), the Court found that, where the plaintiff did not return to work at the end of her FMLA leave period, defendants had no obligation to return the plaintiff to her former job, let alone to any other job.  *See also Dogmanits v. Capital Blue Cross*, 413 F. Supp. 2d 452, 462 (E.D. Pa. 2005) (holding that employees who exhaust the 12 weeks of leave provided by the FMLA stand to lose their entitlement to job restoration even if their employers

provide additional, non-FMLA leave); *Hofferica v. St. Mary Med. Ctr.*, 817 F. Supp. 2d 569, 577 (E.D. Pa. 2011) (holding that once an employee exceeds the duration of her protected leave, the employer is not obligated by the FMLA to keep open the position or to reinstate the employee upon her return). Thus, the Court finds that any alleged misconduct by Defendant after May 22, 2009, the date Plaintiff's FMLA leave expired, cannot give rise to a claim under the FMLA for interference with Plaintiff's alleged right to reinstatement, and that Defendant is not estopped from raising this defense.

The evidence is undisputed that at the conclusion of Plaintiff's FMLA leave, on May 22, 2009, she remained unable to perform the essential functions of her teaching position due to the continuation of her serious health condition.[3] Thus, under 29 C.F.R. § 825.216(c), the FMLA did not entitle her to be restored to her previous position or an equivalent position. *See Sarno*, 183 F.3d at 161; *Ridgeway*, 2013 WL 1985016, at *20; *Ainsworth v. Loudon Cnty Sch. Bd.*, 851 F. Supp. 2d 963, 976 (E.D. Va. 2012) (holding that an employer does not violate the FMLA when it fails to reinstate an employee who is physically unable to return to work at the conclusion of the 12-week period of FMLA leave).

Accordingly, finding no genuine issue of material fact as to Plaintiff's FMLA interference claims asserted in Count I of the Amended Complaint, the Court concludes that Defendant is

---

[3] It is undisputed that in June 2009, Plaintiff continued to inform Bayers that she was hospitalized for continued severe pain (Def.'s St. ¶ 28, admitted by Pl.); that in late July 2009, she informed Bayers that she had been diagnosed with Transverse Myelitis and that getting through the day was a challenge (Def.'s St. ¶ 29, admitted by Pl.); and that on August 4, 2009, Plaintiff forwarded Bayers a note from Dr. McAllister explaining her condition and that "unless we turn the pain around rather dramatically in the next six weeks, she may not be able to work or may be able to only work on a limited basis" (Def.'s St. ¶ 32, admitted by Pl.). In fact, it was not until March 2010 that Dr. McAllister released her to work one day per week in April and two non-consecutive days in May 2010.

entitled to summary judgment in its favor on Count I.

    B.  Plaintiff's FMLA Retaliation Claim

      The second count of Plaintiff's Amended Complaint is for alleged unlawful retaliation under the FMLA.  Plaintiff contends that Defendant terminated her for her use and anticipated future use of protected FMLA leave and her complaints regarding Defendant's conduct (Pl.'s Comp. ¶ 48).  Defendant argues that this claim must fail as a matter of law because Plaintiff cannot demonstrate that she was terminated.

      At the summary judgment stage, FMLA retaliation claims are analyzed under the *McDonnell Douglas Corp. v. Green*, 511 U.S. 792 (1973), burden-shifting framework.  *Potenza*, 365 F.3d at 168; *Weichman v. Chubb & Son*, 552 F. Supp. 2d 271, 289 (D. Conn. 2008). Plaintiff must first make out a prima facie case of retaliation by showing (1) that she exercised rights protected under the FMLA; (2) that she was qualified for the position: (3) that she suffered a material adverse employment action by her employer;[4] and (4) that the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent.  *Potenza*, 365 F.3d at 168.  The burden of proof at this stage has been characterized as "de minimis."  *E.g.*, *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010).  If this initial burden is met, a "presumption of retaliation arises," and the burden shifts to Defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  *Id.*  Defendant's burden is one of production, not persuasion, and it involves no credibility assessment.  *Reeves v. Sanderson Plumbing Prods.*,

---

    [4]  In *Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006), the Supreme Court held that a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, in other words, that it would have dissuaded a reasonable worker from making or supporting a charge of discrimination.

*Inc.*, 530 U.S. at 142 (internal citations and quotation marks omitted).  Defendant must merely

set forth, through admissible evidence, "reasons for its actions which, *if believed by the trier of*

*fact*, would support a finding that unlawful discrimination was not the cause of the employment

action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (emphasis in original).  If

Defendant meets that burden of production,  Plaintiff must establish by a preponderance of the

evidence that Defendant's stated reason was pretextual.  *Serby v. New York City Dept. of Educ.*,

526 F. App'x 132, 134 (2d Cir. 2013);  *Wanamaker*, 899 F. Supp. 2d at 207.

  In ruling on Defendant's motion to dismiss, Judge Bryant held that, in order to establish

pretext, Plaintiff "must submit evidence that would permit a rational fact-finder to infer that the

discharge was actually motivated, in whole or in part, by discrimination." *Id.*  Subsequently, the

Supreme Court handed down its decision in *University of Southwestern Medical Center v.*

*Nassar*, — U.S. —, 133 S. Ct. 2517 (June 24, 2013), which held that a "but-for" standard of

causation, rather than a "motivating factor" standard, applies to Title VII retaliation claims.   In

*Nassar*, the Supreme Court held that "Title VII retaliation claims must be proved according to

the traditional principles of but-for causation," which "requires proof that the unlawful retaliation

would not have occurred in the absence of the alleged wrongful action or actions of the

employer."  *Nassar*, 133 S. Ct. at 2533.

  Relying on the Supreme Court's decision in *Nassar*, Defendant argues that this more

arduous "but-for" standard should apply to Plaintiff's FMLA retaliation claim.

  The cases that have addressed this issue have reached conflicting results.  In *Chaney v.*

*Eberspaecher North America*, — F. Supp. 2d —, 2013 WL 3381437, at *9 n.1 (E.D. Mich. July

8, 2013), the Court held that *Nassar*, which was decided under Title VII, did not change the

applicable causation standards for FMLA retaliation cases.  In *Sparks v. Sunshine Mills, Inc.*, No. CV 3:12-CV-02544, 2013 WL 4760964, at *17 n.4 (N.D. Ala. Sept. 4, 2013), however, the Court reasoned that the "but for" standard of *Nassar* did apply to FMLA retaliation claims because the Eleventh Circuit had interpreted the causation standard as requiring a plaintiff to prove that an employer discriminated against an employee "because" he engaged in an activity protected by the FMLA, which is similar to the statutory language of Title VII on which the *Nassar* Court relied. *See also Taylor v. Rite Aid Corp.*, No. WDQ-12-2858, 2014 WL 320214, at *10 (D. Md. Jan. 27, 2014) (applying the "but for" test of *Nassar* to both Title VII and FMLA retaliation claims); *Latta v. U.S. Steel-Edgar Thompson Plant*, No. 2:11-cv-1622, 2013 WL 6252844, at *5 (W.D. Pa. Dec. 4, 2013) (applying the "but-for" standard of causation to a retaliation claim under the FMLA).

Other courts have not had to reach the issue because, even when the less arduous "motivating factor" standard was applied, the evidence did not create a genuine issue of material fact and, thus, summary judgment was appropriate on the plaintiffs' FMLA retaliation claims. *See Ion v. Chevron USA, Inc.*, 731 F.3d 379, 380 (5th Cir. 2013) (recognizing the issue but not addressing it); *Catay v. Ochsner Clinic Found.*, No. 13-2492, 2014 WL 432518, at *2 n.5 (E.D. La. Feb. 4, 2014) (same); *Reyes v. Texas Health & Human Servs. Comm'n*, No. SA-12-CV-907-XR, 2013 WL 6633993, at *2 n.1 (W.D. Tex. Dec. 17, 2013) (same); *cf. Slade v. Alfred Univ.*, NO. 11-CV-396, 2013 WL 6081710, at *2 (W.D.N.Y. Nov. 19, 2013) (finding triable issues of fact under the "but for" standard and, thus, not addressing whether *Nasssar* applied to FMLA retaliation claims).  As discussed below, because the Court concludes that there is no genuine issue of material fact as to whether Plaintiff's exercise of her exercise of her FMLA rights was a

motivating factor in Defendant's allegedly adverse employment actions, the Court need not address this issue of first impression in the Second Circuit - *i.e.* whether to adopt the "but for" standard of *Nassar* in FMLA retaliation cases.

Assuming - without deciding - that Plaintiff can meet her burden of establishing a prima facie case of FMLA retaliation, Defendant has met its burden of production of a legitimate, non-retaliatory reason for terminating her employment.  Defendant has produced competent evidence that, when Plaintiff's FMLA leave expired, Plaintiff was medically unable to return to work for more than a year.  *See* 29 C.F.R. § 825.216(c) ("If the employee is unable to perform an essential function of the position because of a physical or mental condition . . . the employee has no right to restoration to another position under the FMLA.")  The burden then shifted to Plaintiff to offer some evidence from which a jury could infer that retaliation was at least a motivating factor, if not the "but for" reason, for her termination.  This she has not done.

Plaintiff argues that genuine issues of material fact exist concerning whether Defendant's proffered reason for her termination was a pretext for retaliation.  She argues that a reasonable jury could conclude that Defendant's reason was pretextual because (1) the BOE knew that both she and her daughter had suffered medical setbacks; (2) she had the ability to return to work in the fall of 2010; (3) Landon had an improper animus toward any teacher absences; (4) she, as a tenured teacher with nine years of experience as a computer teacher, was replaced by a classroom teacher with no computer teaching experience, thus negating their desire for classroom continuity in the interests of the students.

Plaintiff, however, was not terminated until fifteen months after her FMLA leave expired on May 22, 2009.  Thus, a temporal proximity between Plaintiff's exercise of her FMLA rights

33

and her termination does not exist.  *See, e.g., O'Reilly v. Consol. Edison Co. of New York, Inc.*, 374 F. Supp. 2d 278, 289 (E.D.N.Y. 2005), *aff'd*, 173 F. App'x 20 (2d Cir. 2006) (finding that a three-month gap between a plaintiff's FMLA leave and termination was insufficient to give rise to an inference of retaliation); *Reilly v. Revlon, Inc.,* 620 F. Supp. 2d 524, 538 (S.D.N.Y. 2009) (same holding with respect to two-and-one-half months).  Plaintiff remained an employee only because her requests for extended leaves of absence were approved by Landon.  In *Reilly*, the plaintiff argued that a retaliatory inference could be drawn because she was terminated while she was on sick leave for the same medical condition that caused her to take FMLA leave.  The court rejected this argument, reasoning that "[i]f plaintiff's argument were accepted by courts, judges would effectively amend FMLA to expand plaintiff's right to reinstatement beyond the twelve weeks provided by Congress, since it would always be possible to infer a retaliatory motive if an employee's condition persisted beyond twelve weeks." 620 F. Supp. 2d at 538.  Additionally, the fact that Plaintiff in this case was given this extended leave after she exhausted her FMLA leave weighs against a finding of retaliatory motive on the part of Defendant.

Accordingly, the Court finds that Plaintiff has failed to carry her burden of showing that her exercise of her rights under the FMLA was a motivating factor for any adverse employment action taken by Defendant.  Therefore, the Court holds that Defendant is entitled to summary judgment on Plaintiff's FMLA retaliation claim asserted in Count II.

Having found in favor of Defendant on both of Plaintiff's FMLA counts, the Court does not address the statute of limitations issue raised by Defendant.

### III.  Plaintiff's ADA Claim

In Count III, Plaintiff alleges that Defendant unlawfully discriminated against her and

34

took adverse actions against her in violation of the ADA, 42 U.S.C. § 12112(a), by (i) not allowing her to return to her computer teacher position; (ii) not providing her with reasonable accommodations; (iii) terminating her employment because of her physical disability; and (iv) terminating her employment because of her known relationship with her daughter who was known to have a disability, namely a congenital heart defect that would require future surgery.

A.  The Timeliness of Plaintiff's ADA Claim

Defendant argues that Plaintiff's ADA claims are untimely to the extent that they are based upon conduct that occurred prior to April 16, 2010, which is 300 days prior to February 10, 2011, the date on which Plaintiff filed her charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").  *See* 42 U.S.C. § 12117(a) (incorporating the enforcement provisions of Title VII, including 42 U.S.C. § 2000e-5, which requires the filing of a charge with the EEOC within either 180 or 300 days[5] of the unlawful employment practice as a prerequisite to any private action under Title VII).  Plaintiff responds that the "continuing violation" exception applies to make the acts occurring outside this 300-day window actionable under Title I of the ADA.

In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the Supreme Court held that the language of the charge-filing provision of Title VII (incorporated into the ADA), 42 U.S.C. § 2000e-5(e)(1), "makes the act of filing a charge within the specified time period mandatory."  *Id.* at 109.  The critical questions are what constitutes an "unlawful

---

[5]  In a state, such as Connecticut, that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee who initially files a charge or grievance with that agency must file the charge with the EEOC within 300 days of the alleged unlawful employment practice.  In all other states, the charge must be filed within 180 days.  42 U.S.C. § 2000e-5(e)(1); *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002).

employment practice" and when has that practice "occurred."  *Id.* at 110.  As for discrete acts of

discrimination or retaliation, the Court held that the act "occurred" on the day that it "happened."

*Id.*  A party, therefore, must file a charge within 180 or 300 days of the date of the act or lose the

ability to recover for it.  *Id.*   Of particular relevance to the instant case is the Supreme Court's

further elaboration that "discrete discriminatory acts are not actionable if time barred, even when

they are related to acts alleged in timely filed charges.  Each discrete discriminatory act starts a

new clock for filing charges alleging that act."  *Id.* at 113.  However,

> [t]he existence of past acts and the employee's prior knowledge of
> their occurrence . . . does not bar employees from filing charges
> about related discrete acts so long as the acts are independently
> discriminatory and charges addressing those acts are themselves
> timely filed. Nor does the statute bar an employee from using the
> prior acts as background evidence in support of a timely claim.

*Id.; see also Kitchens v. U.S. Postal Serv.*, No. 3:05cv195, 2007 WL 1186077, at *3 (D. Conn.

Apr. 19, 2007) (holding that a plaintiff is not barred from using prior acts as background

evidence in support of a timely claim).

Thus, the Supreme Court has rejected the application of the "continuing violation" theory

to discrete acts of discrimination or retaliation, such as termination, failure to promote, denial of

transfer, or refusal to hire, which Plaintiff has alleged in this case.  *National RR Passsenger

Corp.*, 536 U.S. at 114.   In such a case, the employee can only file a charge to cover discrete acts

that "occurred" within the appropriate time period.  *Id.*

Accordingly, the Court holds that the "continuing violation" exception does not apply to

render actionable the alleged acts of discrimination and retaliation that occurred prior to April 16,

2010.

36

That holding, however, does not preclude Plaintiff's pursuit of an ADA claim.  Here, Plaintiff alleges that she was not reinstated to her position as a computer teacher, that she was not afforded a reasonable accommodation, and that was terminated because of her disability, when she sought to return for the 2010-11 school year.  These acts fall within within the 300-day period.  While Plaintiff cannot assert a claim of disability discrimination based upon Defendant's discrete acts of failing to reinstate her prior to April 16, 2010, she may rely on these past events as background evidence in support of her timely claims of discrimination.

### B.  Plaintiff's Prima Facie Case of Discrimination in Violation of Title I of the ADA

The ADA provides in relevant part that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . the discharge of employees . . and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  Under the ADA, an "otherwise qualified individual" with a physical limitation is entitled to a "reasonable accommodation," unless that accommodation would cause an undue hardship to an employer.  42 U.S.C. § 12112(b)(5).  In addition, for purposes of the ADA, a "qualified individual" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 1211(8).

Claims alleging disability discrimination in violation of the ADA are subject to the burden-shifting analysis established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, discussed above.  Plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the discharge; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext.  *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96

37

(2d Cir. 2009).

To make out a prima facie case of disability discrimination with respect to her termination and/or failure to reinstate her to her original position, Plaintiff must show that (1) she is a person with a disability under the meaning of the ADA; (2) Defendant is an employer subject to the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was terminated or suffered some other adverse employment action because of her disability. *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998).   Similarly, to make out a prima facie case of disability discrimination arising out of Defendant's failure to accommodate her, Plaintiff must show that (1) she is a person with a disability within the meaning of the ADA; (2) Defendant is an employer covered by the ADA and had notice of her disability; (3) with reasonable accommodation, she could perform the essential functions of her job; and (4) Defendant refused to make such accommodations. *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006).

For purpose of this motion, Defendant concedes that Plaintiff was disabled under 42 U.S.C. § 12102(3).  Additionally, there is no question that Defendant is an employer covered by the ADA, and that Defendant was aware of her disability.

Defendant argues that Plaintiff cannot make out a prima facie case of disability discrimination both with respect to her alleged termination and her failure to accommodate claims because (1) Plaintiff could not perform the essential functions of her job until the start of the 2011-12 school year; (2) Defendant did not fail to provide a reasonable accommodation; and (3) Plaintiff did not suffer an adverse employment action.

<u>(1) Whether Plaintiff Could Perform the Essential Functions of Her Job?</u>

38

The implementing regulations provide that the term "essential functions" means "the fundamental job duties of the employment position that the individual with a disability holds or desires."  20 C.F.R. § 1630.2(n)(1).  Defendant maintains that the evidence is undisputed that Plaintiff could not perform the essential functions of her job from the time she went on bedrest in February 2009 through the conclusion of the 2009-10 school year.  Defendant, however, overlooks the fact that Plaintiff is claiming that she was not provided reasonable accommodations for the following school year, that she was terminated in the summer of 2010, and that she was not reinstated to her former position for the 2010-11 school year.  On July 1, 2010, Dr. McAllister wrote a letter stating that Plaintiff was able to resume her position as technology teacher.  Thus, at a minimum, there are genuine issues of material fact as to whether Plaintiff could perform the essential functions of her job for the 2010-11 school year.

### (2) Whether Defendant Failed to Provide a Reasonable Accommodation?

Defendant asserts that Plaintiff's claim that it refused to accommodate must fail because Plaintiff's request to be able to work one day a week was not reasonable, as there are no such teaching jobs, although Landon did agree to allow her work as a *per diem* teacher; and any contention that Defendant was required to keep Plaintiff's teaching assignment open indefinitely is an undue hardship.

With respect to Defendant's first argument, as discussed above, a failure to accommodate claim based upon actions taken prior to April 16, 2010, is time-barred.  Dr. McAllister's letter allowing Plaintiff to return to work one-day a week was dated March 2, 2010, and Landon's response denying her request but offering her a *per diem* teaching position is dated March 5, 2010.  Thus, these events fall outside the 300-day period.

With respect to Defendant's claim that it was not required to keep her computer teaching position open indefinitely, that is a correct statement of the law. *See, e.g., Scott v. Memorial Sloan-Kettering Cancer Ctr.*, 190 F. Supp. 2d 590, 596-97 (S.D.N.Y. 2002). However, here, Defendant granted Plaintiff's request for an extension of her leave through the end of the 2009-10 school year, which was a reasonable accommodation. Thereafter, Plaintiff's doctor released her to return to her former computer teaching position.

Defendant argues that Plaintiff never requested a reasonable accommodation with respect to the classroom teaching position that was offered to her in the summer of 2010 and, thus, it cannot be faulted for failing to offer an accommodation that was never requested. While generally it is the responsibility of the individual with a disability to inform the employer of an accommodation that is needed, *Graves*, 457 F.3d at 184, the Second Circuit has held that "an employer has a duty to accommodate an employee's disability if the disability is obvious – which is to say, if the employer knew or reasonably should have known that the employee was disabled." *See Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008). "[T]he ADA contemplates that employers will engage in 'an interactive process' [with their employees and in that way] work together to assess whether an employee's disability can be reasonably accommodated." *Id.* (quoting *Jackan v. New York State Dep't of Labor*, 205 F.3d 562, 566 (2d Cir. 2000)). Here, Defendant clearly was aware of Plaintiff's disability, and, thus, was under an obligation to engage in an interactive process regarding a reasonable accommodation. *See Id.* at 136.

### (3) Whether Plaintiff Suffered an Adverse Employment Action?

An "adverse employment action" is a "materially adverse change in the terms and

40

conditions of employment." *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir.

2000).[6] An employee need not show that he or she was formally demoted or terminated.  An

alteration of an employee's job duties may qualify as a "materially adverse" change where it

"alters the terms and conditions of the [employee's] employment in a materially negative way."

*Patrolmen's Benevolent Ass'n of City of New York v. City of New York*, 310 F.3d 43, 51 (2d Cir.

2002), *cert. denied*, 538 U.S. 1032 (2003).  There is no exhaustive list of what constitutes an

"adverse employment action."  *Weinstein v. Garden City Union Free Sch. Dist.*, No. CV 11-

2509, 2013 WL 5507153, at *22 (E.D.N.Y. Sept. 30, 2013).  The courts have found an adverse

employment action where an employee was given "an assignment that was materially less

prestigious, materially less suited to his [or her] skills and expertise, or materially less conducive

to career advancement." *Galabya*, 202 F.3d at 641.  The Second Circuit has further recognized

that a "lateral transfer that does not result in a reduction in pay or benefits may be an adverse

employment action so long as the transfer alters the terms and conditions of the plaintiff's

employment in a materially negative way." *Patrolmen's Benevolent Ass'n,* 310 F.3d at 51.  In

*Rodriguez v. Board of Education of Eastchester Union Free School District*, 620 F.2d 362, 366

(2d Cir. 1980), the Second Circuit found it "abundantly clear that Congress did not intend to

confine the scope of Title VII simply to instances of discrimination in pecuniary emoluments,"

and held that the plaintiff's transfer from an art teacher position at the junior high school to one

at the elementary school level constituted an adverse employment action. *See also Brown v. Cox*,

---

[6] Courts use the same definition for "adverse employment actions" in discrimination cases brought under the ADA, Title VII of the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967.  *See Brady,* 531 F.3d at 134; *Noon v. Int'l Bus. Mach.*, No. 12 Civ. 4544, 2013 WL 6504410, at *6 n.4 (S.D.N.Y. Dec. 11, 2013).

286 F.3d 1040, 1045 (8th Cir. 2002) (holding that reassignment of nurse from surgical duties to supply room for health reasons was an adverse employment action even though it did not result in a reduction in pay).  Likewise, employments actions that the Second Circuit has deemed sufficiently disadvantageous to constitute an adverse employment action have included a less distinguished titled, significantly diminished responsibilities, or other indices unique to a particular situation.  *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).

After reviewing all of the evidence in the light most favorable to Plaintiff, as the non-moving party, and bearing in mind that the burden of establishing a prima facie case is not onerous, *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981), the Court concludes that there is sufficient evidence to permit a jury to find that Defendant's refusal to reinstate Plaintiff to her computer teaching position was an "adverse employment action" despite the fact that a classroom teacher position would have carried the same salary and benefits.  *See Brady*, 531 F.3d at 134.  Based upon Plaintiff's testimony, the responsibilities and work-loads of the two positions were significantly different; the physical demands and stress associated with the two positions were materially different; and, although Plaintiff was certified to teach all elementary grades, she had acquired ten years of experience and skills teaching only computer courses.  A reasonable juror could conclude that Plaintiff had suffered an adverse employment action.

Regarding the last prong of the *McDonnell Douglas* framework, it is well-settled that a plaintiff can raise an inference of discrimination by showing disparate treatment - namely, that a similarly situated employee outside the protected group received more favorable treatment.  *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15 (1977).  Here, Plaintiff, a tenured teacher with nearly ten years of computer teaching experience, who was disabled, was replaced

by a non-disabled, non-tenured teacher with little if any computer teaching experience.  She has also produced significant evidence that Landon harbored a bias against teachers' absences, and Landon and Bayers were both aware of her situation, as well as the health problems of her child.

The Court concludes that Plaintiff has produced sufficient evidence to meet her initial burden of establishing a prima facie case of disability discrimination.

C.  Whether Plaintiff Can Establish Pretext?

Finding that Plaintiff has produced sufficient evidence to survive summary judgment as to her prima facie case of disability discrimination, the burden now shifts to Defendant to articulate a legitimate, non-discriminatory reason for its actions.  *Texas Dep't of Cmty. Affairs*, 450 U.S. at 254.  Defendant has met its burden of articulating a legitimate, non-discriminatory reason.  Defendant provided Plaintiff with all of the leave that she requested as a reasonable accommodation.  And, according to Landon and Bayers, the decision to permanently replace Plaintiff at the beginning of the 2009-10 school year was done for the consistency of the program and for the benefit of the students.

Defendant argues that Plaintiff cannot establish that her disability was the true reason for their actions - in other words, she cannot establish that Defendant's articulated rationale was a mere pretext for discrimination.  In *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. at 148, the Supreme Court held that a plaintiff's prima facie case, combined with sufficient evidence that the employer's asserted reason is false, may permit the jury to conclude that the employer unlawfully discriminated.   In accordance with *Reeves*, the Second Circuit in *Zimmerman v. Associates of First Capital Corporation*, 251 F.3d 376, 382 (2d Cir. 2001), directed that the task for the court is to examine the entire record and make a case-specific

43

assessment as to whether a finding of discrimination may reasonably be made.

Defendant cites to the fact that, despite its knowledge that Plaintiff and her daughter had physical impairments, it held a job open for her for over a year and welcomed her back when she returned.   But, the evidence does not support that contention.  Defendant did not hold open Plaintiff's job, and when she discussed with them the possibility of returning for the 2009-10 school year, they offered her the position of a building substitute.  When she sought to return for 2010-11, they offered her only a classroom teaching position, which she had not been medically cleared to perform.

Defendant cites to the fact that when Plaintiff's doctor cleared her to return to work one-day a week, it offered her a *per diem* teaching position at her pro-rated salary.  But, the evidence is not that clear.  Plaintiff testified that she understood this position would be at the substitute teaching rate of $90 per day and that Landon never communicated to her that she would be paid at her regular salary rate.

Rather, when the record is reviewed as a whole, the Court finds sufficient evidence to create a genuine issue for trial as to whether Defendant's reason was a pretext for discrimination. There is substantial evidence of Landon's animosity concerning teacher absences.  Plaintiff had significantly more computer experience than her replacement.  Plaintiff was tenured, her replacement was not.  Plaintiff had far less classroom experience than her replacement, thus raising a question as to why Defendant would prefer to have Plaintiff in the classroom.  Plaintiff worked with each of the students once a week and, thus, if she were absent for medical reasons, her absence would have far less impact on the students than as a classroom teacher, who was responsible for the same 20 to 25 students all day, every day.  Moreover, for over three years,

Defendant had been willing to split the computer teacher position between Plaintiff at .8 FTE and another .2 FTE teacher.  Additionally, although Defendant was very accommodating about Plaintiff's requests for extended leave, it never engaged in an interactive process with her to determine what accommodations she would need to return to her former job.  Finally, when Plaintiff was cleared by her doctor in 2010 to return to her computer teaching job, Defendant refused to allow her to return to this position.

Accordingly, after a careful review of the record, the Court concludes that there are genuine issues of material fact as to Plaintiff's disability discrimination claims set forth in Count III and denies Defendant's motion for summary judgment as to Count III.

IV.  Plaintiff's CFEPA Claims

A.  Violation of Conn. Gen. Stat. § 46a-60(a)(1) for Disability Discrimination        \

In Count IV, Plaintiff alleges that Defendant unlawfully discriminated against her in violation of CFEPA, Conn. Gen. Stat. § 46a-60(a)(1), by discharging her from employment and discriminating against her in the terms, conditions, and privileges of employment because of her physical disability.

Connecticut's Fair Employment Practices Act makes it a discriminatory practice for an employer to discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions, or privileges of employment because of, *inter alia*, the individual's physical disability.  Conn. Gen. Stat. § 46a-60(a)(1).

Under CFEPA, a claim of discrimination must be filed within 180 days after the alleged discriminatory act.  Conn. Gen. Stat. Ann. § 46a-82(f).  Since Plaintiff's charge of discrimination was filed on February 10, 2011, only those discrete acts of discrimination occurring on or after

August 14, 2010, are actionable.  The only act that Plaintiff alleges is Defendant's failure to reinstate her.  As discussed above, while evidence of actions prior to this event can be admitted as background evidence, the only acts of discrimination as to which Plaintiff can seek any recovery are those occurring after August 14, 2010.

While CFEPA and the ADA are not identical, Connecticut courts apply the same standards to analyze CFEPA disability claims as are applied to ADA disability claims. *Wanamaker*, 899 F. Supp. 2d at 212 (noting that CFEPA has a broader definition of disability than the ADA).  For the same reasons as set forth above with respect to Plaintiff's claims under the ADA, the Court finds genuine issues of material fact that preclude the grant of summary judgment in favor of Defendant.

B.  Violation of Conn. Gen. Stat. § 46a-60(a)(7) for Pregnancy Discrimination

Count V of Plaintiff's Amended Complaint asserts a state-law claim for pregnancy discrimination under CFEPA, Conn. Gen. Stat. § 46a-60(a)(7).  Plaintiff claims that Defendant refused to grant her a reasonable leave of absence of disability resulting from her pregnancy and refused to reinstate her to her original job or to an equivalent position with equivalent pay, accumulated seniority, retirement, fringe benefits, and other service credits when she indicated her intent to return to work in August 2009.

Subsection 7 of Connecticut's Fair Employment Practices Act provides that it is a discriminatory practice for an employer "(A) [t]o terminate a woman's employment because of her pregnancy; (B) to refuse to grant to that employee a reasonable leave of absence for disability resulting from her pregnancy; . . . . (D) to fail or refuse to reinstate the employee to her original job or to an equivalent position . . . upon her signifying her intent to return . . . ."  Conn. Gen.

Stat. § 46a-60(a)(7).

As Judge Bryant discussed in her ruling on Defendant's motion to dismiss, while there is a paucity of caselaw interpreting this section, it is clear that the refusal to reinstate a pregnant employee to her original job or an equivalent position is a discriminatory practice. *Wanamaker*, 899 F. Supp. 2d at 213 (citing *Zamore v. Dyer*, 597 F. Supp. 923, 927 (D. Conn. 1984)). The Connecticut Supreme Court has held that section 46a-60(a)(7)(D) expressly requires, as a condition precedent to establishing a violation, that the claimant must have signified her intent to return to employment with the employer. *Comm'n on Human Rights & Opportunities v. Truelove and Maclean, Inc.*, 238 Conn. 337, 353 (1996).

Defendant clearly provided Plaintiff with a reasonable maternity leave. And, Plaintiff indicated her desire to return to work in her former position as a computer teacher for the 2010-11 school year, when she wrote Landon, "I would also like to be reinstated to the job of Computer Teacher at Greens Farms School next year." Defendant, however, refused to make her original position available to her and offered her a classroom teaching position in one of five elementary schools. Thus, the question is whether Defendant violated CFEPA by failing to reinstate Plaintiff to her original job or an equivalent position upon her signifying her intent to return. As discussed above, the Court finds genuine issues of material fact as to whether the classroom teaching position offered to Plaintiff for the 2010-11 school year was an "equivalent" position to the computer teaching position for purposes of the CFEPA, a matter not decided in the § 10-151 hearing. Accordingly, the Court denies Defendant's motion for summary judgment as to Count V.

Conclusion

For the reasons set forth above, the Court grants Defendant's Motion for Summary Judgment as to Counts I and II of Plaintiff's Amended Complaint and denies Defendant's Motion for Summary Judgment as to Counts III, IV, and V.

This is a Recommended Ruling.  *See* Fed. R. Civ. P. 72(b)(1).  Any objection to this Recommended Ruling must be filed within 14 days after service.  *See* Fed. R. Civ. P. 72(b)(2).

SO ORDERED, this ___24th___ day of February, 2014, at Bridgeport, Connecticut.


     /s/   *William I. Garfinkel*
WILLIAM I. GARFINKEL
United States Magistrate Judge

48